(No. 80009.—■■■■)

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. ANDREW JOHNSON, Appellant.

*Opinion filed June 18, 1998.—Rehearing denied October 5, 1998.*

Mary Elizabeth Kopko and Ronald D. Haze, of the Office of the State Appellate Defender, of Chicago, for appellant.

James E. Ryan, Attorney General, of Springfield, and Richard A. Devine, State's Attorney, of Chicago (Arleen C. Anderson, Assistant Attorney General, of Chicago, and Renee Goldfarb and Michelle Katz, Assistant State's Attorneys, of counsel), for the People.

JUSTICE NICKELS delivered the opinion of the court:

Following a jury trial in the circuit court of Cook County, defendant, Andrew Johnson, was found guilty of three counts each of murder and armed robbery, and two counts of attempted murder. Defendant waived a jury for the sentencing hearing. The trial court found defendant eligible for the death penalty and sentenced defendant to death for the murder. In addition, the trial court sentenced defendant to two consecutive 30-year terms of imprisonment for the attempted murders. On direct appeal, this court affirmed defendant's convictions and death sentence (*People v. Johnson*, 149 Ill. 2d 118 (1992)) and the United States Supreme Court denied defendant's petition for a writ of *certiorari* (*Johnson v. Illinois*, 506 U.S. 1056, 122 L. Ed. 2d 138, 113 S. Ct. 986 (1993)). Defendant, with the assistance of counsel, then filed a petition for post-conviction relief in the circuit court of Cook County (see 725 ILCS 5/122—1 (West 1994)). The trial court dismissed defendant's post-conviction petition without an evidentiary hearing. Defendant appeals the dismissal of the post-conviction petition (134 Ill. 2d R. 651(a)), seeking a reversal of his conviction or, in the alternative, remand for an evidentiary hearing. For the reasons that follow, we affirm.

BACKGROUND

The evidence supporting the convictions and sentences was thoroughly discussed on direct appeal (*People v. Johnson*, 149 Ill. 2d 118 (1992)), and only a summary is necessary here. On January 20, 1985, defendant,

Andrew Johnson, and two companions, Terry Sanders and Mike Hill, arrived at the home of the murder victim, William Feuling. Feuling invited the three men into his apartment because Sanders was employed at Feuling's family-owned convenience store. At the time, Feuling was being visited by two friends, Art Kozak and Brian Walkowiak. Some time after settling into the apartment and accepting a beer, defendant drew his gun and directed that Feuling and his friends be tied up and gagged.

After the three men were bound, defendant pistol-whipped Feuling in the face and demanded money. The intruders then removed money from the pockets of the three men. Defendant then moved to Kozak, smashed an egg in his face and began to laugh. Defendant demanded more money from Kozak, and when he learned Kozak had none defendant stated Kozak would "have to die." Nevertheless, defendant temporarily spared Kozak after taking Kozak's gold watch. Defendant returned to Fueling and dragged him throughout the apartment demanding the daily receipts from the convenience store. When Feuling could not produce the money, defendant held Feuling up by the arm and stabbed and slashed him repeatedly with a butcher knife about the neck and torso, laughing as he did so. Feuling died as a result of the knife wounds.

Defendant then commanded his two companions to each kill one of Feuling's friends. Defendant gave the butcher knife to Sanders, who first stabbed Kozak in the stomach and then attempted to slit Kozak's throat. Sanders then smashed Kozak in the head with a hammer. After the assault on Kozak, Walkowiak lunged for the door in an attempt to escape. Defendant shot at Walkowiak, striking him in the shoulder. Despite the gunshot wound, Walkowiak continued to run. Believing that both Fueling and Kozak were dead, the three intruders pursued

Walkowiak out the door. However, Walkowiak was able to escape with the assistance of a passing motorist. Subsequently, defendant and Hill approached another individual, Oscar Smith, and attempted to take Smith's car at gunpoint. Defendant and Smith struggled as defendant tried to force Smith into his car. After losing his gun in the struggle with Smith, defendant fled the scene.

A blue nylon parka was discovered in the stairwell of Fueling's apartment building. Defendant's identification card from Joliet Correctional Center was found in the coat pocket. In addition, police recovered defendant's fingerprints from a beer can located on a coffee table in Fueling's living room. On the day after the incident, Kozak and Walkowiak independently identified defendant's picture from a photo array. Before trial, Kozak, Walkowiak, and Oscar Smith all selected defendant from a lineup. In addition, all three men identified defendant at trial.

## POST-CONVICTION PETITION

A post-conviction proceeding is not an appeal of a defendant's underlying judgment, but rather a collateral proceeding enabling the defendant to challenge a conviction or sentence for violations of constitutional rights. *People v. Tenner*, 175 Ill. 2d 372, 377 (1997); *People v. Ashford*, 168 Ill. 2d 494, 500 (1995). To be entitled to post-conviction relief, a defendant must establish a substantial deprivation of federal or state constitutional rights. *Tenner*, 175 Ill. 2d at 378; *People v. Guest*, 166 Ill. 2d 381, 389 (1995). In addition, determinations of the reviewing court on direct appeal are *res judicata* as to issues actually decided and issues that could have been raised in the earlier proceeding, but were not, are deemed waived. *People v. Coleman*, 168 Ill. 2d 509, 522 (1995).

In this case, the trial judge dismissed defendant's post-conviction petition without an evidentiary hearing, concluding that all of the claims had been waived or

resolved on direct appeal. We observe that a defendant is not entitled to an evidentiary hearing unless the allegations of his petition, supported by the trial record or accompanying affidavits where appropriate, make a substantial showing that defendant's constitutional rights have been violated. *People v. Maxwell*, 173 Ill. 2d 102, 107 (1996); *People v. Gaines*, 105 Ill. 2d 79, 91-92 (1984). In addition, the trial court's ruling on a post-conviction petition will not be disturbed unless manifestly erroneous. *People v. Henderson*, 171 Ill. 2d 124, 131 (1996); *People v. Griffin*, 109 Ill. 2d 293, 303 (1985).

On appeal to this court, defendant raises numerous contentions in opposition to the trial court's decision to dismiss his post-conviction petition without an evidentiary hearing. Defendant's principal arguments are based primarily on the alleged ineffective assistance of trial counsel. Although defendant focuses on the performance of his trial counsel, he also claims that his attorney on direct appeal was ineffective for failing to raise certain claims. We observe that the same standards govern the evaluation of the performance of both trial and appellate counsel. *People v. Whitehead*, 169 Ill. 2d 355, 381 (1996). Because these two issues overlap, we will focus on trial counsel's performance. See *Tenner*, 175 Ill. 2d at 378; *Guest*, 166 Ill. 2d at 390. Obviously, if the underlying claim lacks merit, defendant suffered no prejudice due to appellate counsel's failure to raise the issue on direct appeal. *Coleman*, 168 Ill. 2d at 523.

## ISSUES

In this appeal, defendant raises numerous issues that essentially claim that his trial counsel was ineffective because he failed to: (1) request a *Batson* hearing; (2) present testimony of an alibi witness; (3) request a fitness hearing; (4) argue that defendant lacked the capacity to form the requisite intent to commit murder; (5) argue that defendant lacked the capacity to waive his

right to a jury at sentencing; and (6) investigate and present available mitigating evidence. Defendant also claims that his death sentence is (7) unconstitutional because he was sentenced without the benefit of mitigating evidence his counsel failed to discover. Finally, defendant claims (8) the Illinois death penalty statute is unconstitutional.

### Effectiveness of Counsel During Guilt Phase

Defendant raises a series of contentions which focus on his counsel's performance before and during trial. These claims are based on a defendant's constitutional guarantee to the assistance of counsel (U.S. Const., amends. VI, XIV), which encompasses the right to the effective assistance of counsel (*Cuyler v. Sullivan*, 446 U.S. 335, 343-44, 64 L. Ed. 2d 333, 343-44, 100 S. Ct. 1708, 1715-16 (1980)). To be successful on his claims, defendant must satisfy the two-prong *Strickland* test. See. *Strickland v. Washington*, 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052 (1984). Under *Strickland*, a defendant must show that (1) his counsel's performance fell below an objective standard of reasonableness; and (2) counsel's deficient performance resulted in prejudice to defendant. *Strickland*, 466 U.S. at 687-88, 80 L. Ed. 2d at 693-94, 104 S. Ct. at 2064-65; *People v. Albanese*, 104 Ill. 2d 504, 525-26 (1984). A strong presumption exists that defense counsel's performance falls within the "wide range of reasonable professional assistance" and, thus, is not deficient. *Strickland*, 466 U.S. at 689, 80 L. Ed. 2d at 694-95, 104 S. Ct. at 2065. In addition, to demonstrate prejudice resulting from counsel's asserted deficient performance, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694, 80 L. Ed. 2d at 698, 104 S. Ct. at 2068. With these principles in mind, we now turn to defendant's claims regarding his counsel's performance during the guilt-innocence phase.

## 1. *Failure to Request a Batson Hearing*

Defendant contends that his trial counsel was ineffective because he failed to request a hearing pursuant to *Batson v. Kentucky*, 476 U.S. 79, 90 L. Ed. 2d 69, 106 S. Ct. 1712 (1986) to explore the State's discriminatory use of peremptory challenges against African-American venirepersons. The record reveals that defendant's counsel did indeed object to the State's use of peremptory challenges. Early in the jury selection process, the following colloquy occurred:

> "MR. BROWNFIELD [defense attorney]: Judge, I believe in that twenty-seven there has only been three blacks and the State has knocked off all three blacks.
>
> MR. TRUTENKO [assistant State's Attorney]: That's not true. That's not true.
>
> MS. ROUSE [defense attorney]: Two.
>
> MR. VELCICH [assistant State's Attorney]: Maurice Miller is black, left on.
>
> MR. BROWNFIELD: What number is that?
>
> MR. TRUTENKO: Number thirteen.
>
> MR. VELCICH: Thirteen.
>
> MR. BROWNFIELD: I'm sorry. I withdraw my objection."

The jury selection continued and defense counsel raised no additional objections to the State's use of its peremptory challenges.

Defendant argues that trial counsel was deficient in failing to renew his objection and subsequently request a *Batson* hearing. In support of his claim, defendant attached two sets of handwritten notes allegedly taken by his defense attorneys contemporaneously with *voir dire*. Defendant also attached copies of the jury summons and corresponding juror information forms for six venirepersons who were stricken by the State with peremptory challenges. Defendant contends that this evidence establishes that the State exercised a discriminatory pattern of strikes against African-Americans and also utilized a disproportionate number of its peremptory

challenges against African-Americans. See *People v. Andrews*, 146 Ill. 2d 413, 428-30 (1992). Defendant argues that this evidence, combined with the interracial nature of the crimes, clearly establishes a *prima facie* case of racial discrimination. See *Batson*, 476 U.S. at 96, 90 L. Ed. 2d at 87, 106 S. Ct. at 1723. Notwithstanding defendant's arguments, based on the record before us, we find that defendant failed to make a substantial showing of a *Batson* violation.

The defendant asserting a *Batson* violation bears the burden of preserving the record. *People v. Hudson*, 157 Ill. 2d 401, 428 (1993). For a meaningful appellate review of the issue, the record must disclose the race of the venirepersons. *People v. McDonald*, 125 Ill. 2d 182, 194-95 (1988). Moreover, any ambiguities in the record on the issue are construed against the defendant. *Hudson*, 157 Ill. 2d at 428.

We initially observe that the notes defendant alleges his trial attorneys recorded during *voir dire* are not supported by affidavit or authenticated in any manner. The Post-Conviction Hearing Act requires the defendant's petition to support his allegations of constitutional violations by "affidavits, records, or other evidence." 725 ILCS 5/122—2 (West 1994). Evidence supporting defendant's post-conviction allegations must be accompanied by an affidavit which identifies with reasonable certainty the source, character, and availability of the alleged evidence. *People v. Johnson*, 154 Ill. 2d 227, 239-40 (1993). Without supporting affidavits, this court is unable to determine the source of the notes defendant offers or whether they were written contemporaneously with *voir dire*.

Even if the *voir dire* notes were properly supported, their contents are too ambiguous to substantiate defendant's claim. First, the race of all the venirepersons was not recorded. See *McDonald*, 125 Ill. 2d at 194-95. More-

over, the notes, apparently written by at least two persons, contain disparities in the race recorded for several venirepersons. In addition, the juror information cards defendant offers contain absolutely no information indicative of the race of the stricken venirepersons.

Generally, a post-conviction petition which is not properly supported by affidavits or other evidence is dismissed without an evidentiary hearing unless the petitioner's allegation stands uncontradicted and is clearly supported by the record. *Johnson*, 154 Ill. 2d at 240. Here, the trial record establishes that the State exercised 12 of its 14 available peremptory challenges. The portion of *voir dire* quoted above establishes that at least one African-American served on the jury and that the State used two of its peremptory challenges to strike African-American venirepersons (see *People v. Andrews*, 132 Ill. 2d 451, 460-61 (1989) (trial counsel's statement on the record is adequate evidence to establish African-American venirepersons were peremptorily challenged)). Nevertheless, an inference of racial discrimination is not raised simply because African-American venirepersons were peremptorily challenged. *Batson*, 476 U.S. at 101, 90 L. Ed. 2d at 91, 106 S. Ct. at 1725 (White, J., concurring); *People v. Coleman*, 155 Ill. 2d 507, 513 (1993). Therefore, defendant's allegation of a *Batson* violation is not supported by the record and, accordingly, the trial court's dismissal of this claim without an evidentiary hearing was not against the manifest weight of the evidence.

2. *Failure to Present Testimony of an Alibi Witness*

Defendant next argues that trial counsel was ineffective because he failed to present the testimony of an alibi witness, Dennis Taylor. Defendant supports this claim with the affidavit of Darlene Taylor, defendant's girlfriend and Dennis' sister. In her affidavit, Darlene states that Dennis was at her apartment the day of the murder and

could have testified to essentially the same facts that she did at trial. Darlene further avers that counsel never interviewed her brother, who has since died.

In order to support a claim of failure to investigate and call a witness, a defendant must tender an affidavit from the individual who would have testified. Without such an affidavit, a reviewing court cannot determine whether the proposed witness could have provided any information or testimony favorable to defendant. *Guest,* 166 Ill. 2d at 402; *People v. Ashford,* 121 Ill. 2d 55, 77 (1988); see also *People v. Barr,* 200 Ill. App. 3d 1077, 1080 (1990). Because defendant has failed to provide an affidavit from Dennis Taylor, further consideration of his purported testimony is unnecessary. *Guest,* 166 Ill. 2d at 402. Even assuming defendant's allegation was sufficiently supported, Dennis' testimony was apparently to be cumulative (see *Henderson,* 171 Ill. 2d at 155 (counsel cannot be deficient for failing to present cumulative evidence)). We also conclude that defendant would not meet the second prong of *Strickland.* The evidence of defendant's guilt was overwhelming and defendant has failed to demonstrate on this record that there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland,* 466 U.S. at 694, 80 L. Ed. 2d at 698, 104 S. Ct. at 2068.

### 3. *Failure to Request a Fitness Hearing*

Defendant next contends that his trial counsel was ineffective because he failed to request a fitness hearing. Specifically, defendant cites to an opinion by Dr. Michael Gelbort, a psychologist who evaluated defendant for his post-conviction petition, that defendant was intellectually incapable of understanding the admonitions of the trial court regarding his waiver of jury for sentencing. Observing that "a person whose mental condition is such that he lacks the capacity to understand the nature and

object of the proceedings against him, to consult with counsel, and to assist in preparing his defense may not be subjected to a trial" (*Drope v. Missouri*, 420 U.S. 162, 171, 43 L. Ed. 2d 103, 113, 95 S. Ct. 896, 903 (1975)), defendant reasons that he was, therefore, prejudiced by not receiving a fitness hearing.

A defendant is presumed to be fit to stand trial. 725 ILCS 5/104—10 (West 1994). A defendant is entitled to a pretrial fitness hearing only when a *bona fide* doubt of his fitness to stand trial or be sentenced is raised. *People v. Eddmonds*, 143 Ill. 2d 501, 512 (1991); see also *Godinez v. Moran*, 509 U.S. 389, 401 n.13, 125 L. Ed. 2d 321, 333 n.13, 113 S. Ct. 2680, 2688 n.13 (1993) ("As in any criminal case, a competency determination is necessary only when a court has reason to doubt the defendant's competence"). Therefore, in order to establish that he was prejudiced by his trial counsel's alleged incompetency, defendant "must demonstrate that facts existed at the time of his trial which raised a *bona fide* doubt of his ability to understand the nature and purpose of the proceedings and to assist in his defense." *Eddmonds*, 143 Ill. 2d at 512-13. Defendant is entitled to relief on this post-conviction claim only if he demonstrates that the trial court would have found a *bona fide* doubt of his fitness and ordered a fitness hearing if it had been apprised of the evidence now offered. *Eddmonds*, 143 Ill. 2d at 513.

The critical inquiry is whether the facts presented in defendant's post-conviction petition raised a *bona fide* doubt of his fitness to stand trial. The trial court hearing defendant's post-conviction petition determined that they did not. We do not consider this finding against the manifest weight of the evidence.

Defendant bears the burden of showing that, at the time of trial, there were facts in existence which raised a substantial and legitimate doubt as to his mental capac-

ity to cooperate with counsel and meaningfully participate in his defense. *Eddmonds*, 143 Ill. 2d at 518. Factors which are relevant to this consideration include (1) a defendant's irrational behavior; (2) his demeanor at trial; and (3) any prior medical opinion on competence to stand trial. *Drope*, 420 U.S. at 180, 43 L. Ed. 2d at 118, 95 S. Ct. at 908.

Defendant offers no evidence regarding his demeanor or that he acted irrationally at trial. In addition, there was no prior medical opinion on defendant's competence to stand trial. The only evidence defendant cites to show there was a *bona fide* doubt of his fitness was Dr. Gelbort's opinion that defendant was incapable of understanding the court's admonitions regarding his jury waiver. A defendant's limited intellectual ability, without more, does not render him unfit to stand trial. *People v. Murphy*, 72 Ill. 2d 421, 432-33 (1978). Notably, Dr. Gelbort did not determine that defendant was unfit to stand trial or be sentenced. Rather, Dr. Gelbort essentially determined that defendant, because of his inability to comprehend complex sentences, would not understand the judge's explanations regarding the jury waiver. The facts offered by defendant fall short of raising a *bona fide* doubt of his fitness.

The cases on which defendant relies are inapposite. See *People v. Murphy*, 160 Ill. App. 3d 781 (1987); *People v. Howard*, 74 Ill. App. 3d 138 (1979). Both those cases involved situations where the circumstances at the time of the trial made it readily apparent that there was a question as to the competency of defendant. See *Murphy*, 160 Ill. App. 3d at 783, 789 (counsel was aware defendant attempted suicide during trial and was incarcerated in mental ward); *Howard*, 74 Ill. App. 3d at 140 (counsel was aware defendant had been institutionalized). Defendant has offered no facts which indicate there were reasonable grounds at the time of trial to question his

competency. Accordingly, defendant was not entitled to post-conviction relief on this claim.

### 4. *Failure to Argue Defendant Lacked Requisite Intent*

Defendant next contends that his trial counsel was ineffective for failing to argue that, due to defendant's mental impairments, defendant was incapable of forming the intent necessary to be found guilty of murder. Defendant concludes that the absence of a finding of the requisite intent would necessarily preclude the death sentence imposed for his conviction of felony-murder. See *People v. Pugh*, 157 Ill. 2d 1, 17 (1993).

The defense theory at trial was that defendant played no role in the offenses for which he was charged. An argument such as the one defendant proposes here would have directly contradicted that theory by admitting defendant's involvement in the robbery and attributing to him the acts that caused the victim's death. This court has previously held that, when the defense theory is one of innocence, trial counsel is not ineffective for failing to make such an argument. See *People v. Todd*, 178 Ill. 2d 297, 331-32 (1997).

Thus, we find no merit to defendant's claims concerning the effectiveness of his trial counsel during the guilt-innocence phase.

### Effectiveness of Counsel During Sentencing Phase

Defendant next contends that the trial court erred in dismissing his post-conviction petition without an evidentiary hearing on his claim that he was denied effective assistance of counsel at the sentencing phase of trial. We observe that defendant's claims that he received ineffective assistance of counsel at his capital sentencing hearing are also governed by the *Strickland* standard. *People v. Caballero*, 126 Ill. 2d 248, 274 (1989). This standard requires the defendant to show (1) that his attorney's performance at the sentencing hearing did not

constitute reasonably effective assistance, judged by prevailing professional norms (*Strickland*, 466 U.S. at 688, 80 L. Ed. 2d at 694, 104 S. Ct. at 2065), and (2) there is reasonable probability that, absent the errors, the sentencer would have concluded that the balance of aggravating and mitigating factors did not warrant death (*Strickland*, 466 U.S. at 695, 80 L. Ed. 2d at 698, 104 S. Ct. at 2069).

Defendant makes several assertions in support of his ineffectiveness claim and essentially argues that his trial counsel (1) failed to argue defendant lacked the capacity to waive his right to a jury for sentencing; (2) was *per se* ineffective because he represented defendant alone and developed no mitigation strategy; (3) failed to investigate and present available mitigating evidence of defendant's mental impairments; (4) failed to discover specific evidence that defendant suffered from an extreme emotional disturbance; and (5) failed to discover other key mitigating evidence.

## 1. *Capacity to Waive Jury*

In defendant's first claim regarding the sentencing phase of trial, defendant contends that his counsel was ineffective for failing to argue that defendant lacked the capacity to waive his right to a jury for sentencing. In support of this claim, defendant cites to Dr. Gelbort's opinion that, based on defendant's low IQ and inability to comprehend complex sentences, defendant's jury waiver "was not based upon a clear or normal understanding of the judge's explanation." In addition, defendant notes his paranoia, illiteracy, and general mental deficiencies as other evidence demonstrating his inability to knowingly waive his jury rights.

A defendant's right to a jury at a capital sentencing hearing is statutory in origin. 720 ILCS 5/9—1(d) (West 1994); *Todd*, 178 Ill. 2d at 312. The waiver of the right to a jury must be knowing, intelligent, and voluntary.

*Maxwell*, 173 Ill. 2d at 117. There exists no prescribed formula that must be used by a judge prior to accepting a defendant's jury waiver for a death penalty hearing. *Todd*, 178 Ill. 2d at 312. Rather, each case turns on its own facts and circumstances. *Maxwell*, 173 Ill. 2d at 117.

Regarding defendant's waiver of jury for sentencing, the record includes the following colloquy:

"MR. BROWNFIELD [defense attorney]: Yes, Judge. My client, Andrew Johnson, is before the Court, Judge, and I have had a conversation with my client while this case is pending and once again yesterday just to go over it with him again and it's my client's desire that if, in fact, the jury in this case does find my client guilty that he desires to waive his right to a jury on the death phase of this trial now before trial. And, in fact, if he is found guilty by the jury that we are about to select, I would ask that your Honor make that determination.

I also advised him that if he waives it at this time that it's irrevocable, that you will be the person that decides that no matter—no matter, but if the jury doesn't find him guilty and he waives it now, we will not get a jury on the death phase of this trial.

THE COURT: Mr. Johnson, do you understand that you have a right under the law to have the jury decide, if this jury determines that you are guilty of these crimes, to have a jury decide whether or not, one, you are eligible for the death penalty and, two, whether under the facts and circumstances in your record you should receive the death penalty?

Do you understand you have that right?

DEFENDANT JOHNSON: Yes.

THE COURT: Okay. What your attorney has said is that you want to give up that right to the jury portion of the sentencing procedure at this time.

Is that what you want to do?

DEFENDANT JOHNSON: Yes.

THE COURT: Do you understand that I will then be the one who will have to determine whether or not, first, you are eligible to be sentenced to death and then, number two, whether or not under the facts and cir-

cumstances here whether you should or should not be sentenced to death.

Do you understand that, sir?

DEFENDANT JOHNSON: Yes.

THE COURT: Do you understand that once you make this decision and you waive at this time I will not let you out of that waiver. I will not allow you later on to come back to me and say, Judge, I change my mind. I want a jury to decide whether I should get the death penalty.

Do you understand that?

DEFENDANT JOHNSON: Yes.

THE COURT: Okay. Is there a jury waiver form? You can amend it so it would appear that way.

Let the record indicate that I have talked to Andrew Johnson. I have asked him specifically if he understands that he has a right to a jury trial for the penalty stage and that if he gives up that right that I will be the one to determine whether he's to receive the death penalty or not and that I will not allow him to waive that death penalty—his election now at some later date.

Also, you understand, Mr. Johnson, that I have made no promises as to what my decision is going to be.

Do you understand that also?

DEFENDANT JOHNSON: Yes.

THE COURT: Okay. Let the record indicate that in open Court and in my presence Andrew Johnson is signing the waiver of his right to a jury to determine the penalty aspect at the conclusion of this case.

\* \* \*

THE COURT: I'm going to ask you to sign it once more, Mr. Johnson. This says here, I, Andrew Johnson, do hereby waive jury trial and submit the above-entitled cause to the Court for a hearing as to the penalty to be imposed in the event the jury who will determine guilt or innocence determines that I am guilty.

I would like you to sign your name right below that if that is what you want to have done. (Document executed).

MR. BROWNFIELD: Tender that to the Court signed by my client.

THE COURT: I will accept the waiver.

The waiver has been made in open Court. I believe it's been made knowingly and intelligently by Mr. Johnson in response to my questions."

We believe that this inquiry by the trial court was sufficient to insure that defendant's jury waiver was knowing, intelligent, and voluntary.

Despite defendant's contention, evidence of a limited intellectual capacity, by itself, does not indicate that a defendant is incapable of waiving his constitutional rights. *People v. Mahaffey*, 165 Ill. 2d 445, 462 (1995). In addition, the opinion of a psychologist does not mandate a similar finding from the court. *Pugh*, 157 Ill. 2d at 24. Moreover, when assessing whether a defendant was aware of his rights, the defendant's prior contacts with the criminal justice system are relevant. See *Mahaffey*, 165 Ill. 2d at 463. Notably, defendant had an extensive criminal history, beginning at age 13.

The trial court is in the best position to evaluate defendant's ability to understand his rights. *Mahaffey*, 165 Ill. 2d at 463. The trial judge hearing the defendant's post-conviction petition, the same judge who presided over defendant's trial and sentencing, rejected defendant's allegation that he lacked the capacity to waive his right to a jury. This finding is not against the manifest weight of the evidence.

## 2. *Mitigation Strategy*

Defendant argues that defense counsel failed to develop a mitigation strategy and was, in essence, *per se* ineffective because he alone represented defendant during the capital sentencing hearing. In support of this contention, defendant argues that his assigned public defender (1) presented scant evidence in mitigation; (2) was not specifically trained in the area of mitigation; and (3) was provided no mitigation assistance by the public defender's office. In addition, defendant cites *People v.*

*Perez*, 148 Ill. 2d 168 (1992), for the proposition that an attorney should never defend a capital murder case alone.

First, we find that the record clearly shows that defense counsel did have a mitigation strategy. Prior to the sentencing phase, defense counsel commissioned the National Center on Institutions and Alternatives ("NCIA") to investigate defendant's background and prepare a comprehensive report for consideration by the sentencing court. At defendant's sentencing hearing, defense counsel presented the testimony of several of defendant's siblings, who testified to defendant's good nature and how defendant assisted with family responsibilities. In addition, defendant's older brother testified of their mother's serious illness and the hardship and stress she would suffer should defendant be put to death.

Counsel also moved for, and was granted, the right for defendant to speak in allocution. In doing so, defendant spoke of his limited education and lack of parental guidance, and pleaded for the court's mercy. In closing argument, defense counsel observed defendant's remorse and spoke of defendant's poor and neglected family life, specifically referring to the NCIA and pre-sentence investigation reports and their contents. Thus, we find no merit to defendant's argument that counsel failed to develop a theory in mitigation.

Defendant's other arguments do not demonstrate that his counsel's performance fell below an objective standard of reasonableness. Although defendant's trial counsel stated in his affidavit that he was not provided any mitigation assistance and was not specifically trained in the area of mitigation, he was an experienced public defender who had previously represented many capital defendants. See *People v. Sanchez*, 169 Ill. 2d 472, 492 (1996) (even if defense counsel's first capital case that alone does not establish incompetence); *People v. Thomas*, 164 Ill. 2d 410, 434 (1995) (not *per se* ineffectiveness because counsel had no capital experience).

We similarly reject defendant's reliance on *Perez* for the contention that his counsel was *per se* ineffective because he alone represented defendant at the sentencing hearing. Initially we note that the text of *Perez* to which defendant refers is the opinion of a witness testifying in that case, who stated that "no attorney should try a capital case alone." *Perez*, 148 Ill. 2d at 183. Although this court subsequently determined that the *Perez* defense counsel was ineffective, our finding was not grounded on the fact that counsel worked alone. See *Perez*, 148 Ill. 2d at 186-87. Moreover, the record in the present case reveals that defendant was represented by two attorneys throughout his trial. Defendant has not established ineffective assistance of counsel merely because only one attorney was present at his sentencing hearing.

3. *Evidence of Defendant's Mental Impairments*

Defendant next argues that his counsel was ineffective because he failed to investigate and present available mitigating evidence that defendant was mentally impaired. In support of this contention, defendant offered affidavits from two of his siblings, which stated that when defendant was a young boy he placed a fork into an electrical outlet and received a shock. Defendant contends that, had counsel investigated his family background, he would have learned of defendant's purported electrocution, which would have indicated a need to further evaluate defendant's mental abilities.

Defense counsel's failure to investigate mitigating evidence, under certain circumstances, can be deemed deficient performance. See *Perez*, 148 Ill. 2d at 189-91. Nevertheless, we do not find counsel's performance deficient in the instant case. The record indicates that defense counsel did indeed interview defendant about his background and family life. In addition, defense counsel commissioned the NCIA to investigate defendant's

background and draft an extensive report. However, the NCIA report indicates that defendant's family rejected numerous requests to be interviewed about defendant. Furthermore, no medical records exist on the incident where defendant was shocked and other records state that defendant never suffered from any serious injury or illness. See *People v. Brisbon*, 164 Ill. 2d 236, 250-51 (1995) (affidavits of family members asserting defendant's brain damage, without supporting medical records, are insufficient to establish counsel's deficiency). Therefore, the record does not persuasively establish that counsel's failure to learn of the incident was due to his negligence or incompetence. See *Eddmonds*, 143 Ill. 2d at 533.

Defendant also offered copies of his school records through the ninth grade, the year he dropped out of school. These records consist of grade reports, IQ testing results, and the report of a school psychologist written when defendant was nine years of age. Defendant contends that counsel should have inquired into defendant's education because defendant had informed counsel that he was "slow" in school and did not reach the ninth grade until he was 18 years old. Defendant asserts that these records, if discovered by counsel, would have indicated that defendant suffered severe mental disabilities.

Defendant's school records reveal that in elementary school it was determined that defendant failed to achieve at expected levels and had a slow rate of mental growth. The school psychologist determined defendant would benefit from a special education program, which defendant was referred to at age nine. For two years of defendant's elementary education, he received grades indicating unsatisfactory progress. However, in all the other years, defendant received grades indicating either acceptable or good progress. Results of IQ tests conducted when defen-

dant was nine years of age indicated an IQ between 73 and 76. In addition, the records show that defendant was actually only 15 years old when he dropped out of school.

Defendant also offered the results of Dr. Gelbort's psychological evaluation of defendant. Dr. Gelbort compiled this evaluation for defendant's post-conviction petition after reviewing defendant's records, court files, and the post-conviction evidence, and conducting psychological tests and personal interviews with defendant. Testing by Dr. Gelbort indicated defendant's IQ was between 71 and 82. In Dr. Gelbort's opinion, defendant suffered from mild mental retardation and a schizotypal personality disorder.

Even if we assume that defendant's trial counsel was incompetent for failing to learn of defendant's educational inadequacies and consequently submitting defendant to psychological evaluation, defendant has failed to demonstrate how these facts create a reasonable probability that the sentencing judge "would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Strickland*, 466 U.S. at 695, 80 L. Ed. 2d at 698, 104 S. Ct. at 2069. Initially, we note that there is information in the school records that is potentially aggravating to defendant. Defendant's high school records indicate that he was excessively truant. Moreover, defendant dropped out of school after he was caught breaking into the school building. See *Henderson*, 171 Ill. 2d at 154 (truancy and lack of interest in education are aggravating); *People v. Jones*, 144 Ill. 2d 242, 274 (1991) (same).

Furthermore, the type of psychological evidence defendant offers is not inherently mitigating. Although evidence of defendant's psychological or educational disabilities may have evoked compassion from the sentencer, it also could have demonstrated defendant's continued dangerousness. See *Coleman*, 168 Ill. 2d at 537-38 (some

characteristics of personality disorders are aggravating); *People v. Franklin*, 167 Ill. 2d 1, 27 (1995) (psychological problems could show a need to protect society from the defendant because he is not deterrable); *Jones*, 144 Ill. 2d at 274 (psychological report reveals information damaging to defendant).

Defendant also relies on *People v. Perez*, 148 Ill. 2d 168 (1992), where this court ordered a new sentencing hearing because defense counsel was deficient for failing to investigate and present mitigating evidence. Nevertheless, that case is inapposite. *Perez* dealt with a defendant who had little evidence in aggravation and a great deal of evidence in mitigation which his attorney failed to introduce in any manner. In the instant case, defense counsel presented mitigating testimony and proffered a report from an in-depth investigation into defendant's background. Moreover, unlike *Perez*, this defendant has a great deal of aggravating evidence that was overwhelming compared to any evidence in mitigation. See *Coleman*, 168 Ill. 2d at 539-40; *Ashford*, 168 Ill. 2d at 506; *Thomas*, 164 Ill. 2d at 430.

The aggravating evidence in the instant case established that defendant planned and directed the armed robbery of three individuals in a private home. During this robbery, defendant taunted and humiliated the victims while they were bound and gagged. Defendant then savagely killed William Feuling, laughing as he did so. He then directed his accomplices to execute the other two robbery victims. When one of the victims fled, defendant shot him in order to prevent the escape. The evidence also showed that defendant participated in the armed assault and attempted kidnapping of Oscar Smith shortly after the robbery. The State's evidence also established that defendant had an extensive history of criminal behavior, beginning at age 13 and continuing until his arrest for the Feuling murder. Moreover, this

murder occurred only one month after defendant was released from the Department of Corrections. Furthermore, the State's evidence showed that while defendant was incarcerated awaiting sentencing, he attempted to escape from the Cook County jail.

Defendant does not dispute that his individual circumstances constitute overwhelming evidence of aggravation. Rather, defendant cites several cases involving similar heinous murders where the defendant was not sentenced to death. See *People v. Allen*, 228 Ill. App. 3d 149 (1992); *People v. Rodriguez*, 227 Ill. App. 3d 397 (1991); *People v. Hartzol*, 222 Ill. App. 3d 631 (1991); *People v. Wilson*, 133 Ill. App. 3d 265 (1985); *People v. Wilson*, 132 Ill. App. 3d 862 (1985). Defendant's argument is essentially a request for proportionality review, which was raised and rejected on direct appeal and is thus barred by *res judicata* (see *Johnson*, 149 Ill. 2d at 158).

We cannot conclude that defendant suffered prejudice as a result of this alleged deficiency of his trial counsel. Accordingly, the trial court did not err in dismissing defendant's claim without an evidentiary hearing.

4. *Evidence of Extreme Emotional Disturbance*

Defendant next argues that his counsel was ineffective for failing to present evidence that he suffered from an extreme emotional disturbance at the time these crimes were committed. Defendant observes that whether a defendant was acting under the influence of an extreme emotional disturbance at the time of the murder is one of the factors to be considered in mitigation, and may be a basis for imposing a sentence other than death. See 720 ILCS 5/9—1(c)(2) (West 1994). Defendant cites Dr. Gelbort's diagnosis that defendant suffers from a schizotypal personality disorder as evidence that defendant was operating under the influence of an extreme emotional disturbance at the time of these crimes.

We do not believe that defendant's counsel was ineffective for failing to make this particular argument at sentencing. A defendant is under the influence of an extreme emotional disturbance when his emotional state at the time of the murder is at "such a fragile point as to leave him with little to no emotional control." *People v. Phillips*, 127 Ill. 2d 499, 534 (1989). There was nothing about defendant's personal history or these particular crimes which would have prompted counsel to explore such a mitigation strategy.

Moreover, we find it unlikely that the additional evidence offered by defendant would have caused the sentencing judge to conclude that defendant was under the influence of an extreme emotional disturbance at the time of these crimes. Defendant acted in a composed and rational manner at the time of the murder. Defendant acted coherently, speaking to the victims and drinking a beer with them. Subsequently, defendant directed the robbery and then ordered the execution of all the victims. It is also apparent defendant appreciated the criminality of his acts, as he concocted a story to protect himself and explain why his coat would be found at the scene. Given all the evidence considered by the sentencing court, including the brutal facts of the crime and defendant's extensive criminal record, defendant has failed to demonstrate a reasonable probability that the sentencing judge would not have imposed the death penalty if counsel had presented Dr. Gelbort's testimony in an attempt to demonstrate that defendant acted under an extreme emotional disturbance at the time of the murder. See *Henderson*, 171 Ill. 2d at 152; *Coleman*, 168 Ill. 2d at 538-39 (and cases cited therein); *People v. Foster*, 168 Ill. 2d 465, 491-92 (1995).

Defendant's reliance on cases in which this court has vacated the death sentence is misplaced. See *People v. Leger*, 149 Ill. 2d 355 (1992); *People v. Johnson*, 128 Ill.

2d 253 (1989); *People v. Carlson*, 79 Ill. 2d 564 (1980). Defendants in those cases, in addition to suffering from severe emotional disturbances at the time of their crimes, had no significant prior criminal records. Here, defendant has failed to establish that he was operating under an extreme emotional disturbance at the time of the crimes. Furthermore, the record demonstrates that defendant had an extensive criminal background.

### 5. *Other Evidence in Mitigation*

Defendant also contends that defense counsel was ineffective because he failed to investigate and present other key mitigating facts. In his post-conviction proceedings, defendant offered the affidavits of his girlfriend and several siblings. According to the affidavits, these witnesses would testify that defendant was a quiet and sweet-natured individual who was always helpful and obedient to his parents. In addition, some of the witnesses would testify that defendant was physically abused by his alcoholic father. Furthermore, defendant offered copies of his juvenile court records, which included a family investigation by his probation officer detailing defendant's dysfunctional family life.

Even if we assume that counsel was incompetent for failing to offer the testimony of these witnesses, we find for several reasons that defendant was not prejudiced as a result. First we find that the evidence now offered by defendant was essentially cumulative of information presented at the sentencing hearing by trial counsel or considered by the sentencing court from other sources. At the sentencing hearing, defendant's siblings testified about defendant's good nature and helpfulness. Additionally, the sentencing court considered much of this information from other sources. Through the NCIA report, the sentencing judge learned extensive information about the poverty of defendant's family and defendant's dysfunctional upbringing. The additional testimony of-

fered by defendant on these points would have been cumulative. Defense counsel's performance cannot be considered deficient because of a failure to present cumulative evidence. *Henderson*, 171 Ill. 2d at 155.

Furthermore, portions of the proposed testimony are either untrue or not helpful to defendant. For example, one proposed sibling would have testified that defendant was always obedient to their parents. This point is refuted by the record, which indicates defendant was a continual juvenile offender and was once arrested for stealing from his parents. In addition, defendant's girlfriend's version of defendant's family life included defendant being beaten with a police stick and having his head rammed against a wall. In comparison, defendant's siblings merely state that defendant "might have been" or was "maybe" physically abused. Moreover, the juvenile records detail defendant's extensive criminal background, which began in his early teen years and culminated in increasingly violent offenses. Furthermore, the description of defendant as a peaceful, nonviolent follower simply does not correspond to the accounts of the crimes, which demonstrate defendant's nature as a domineering and ruthless killer.

As we previously noted, the evidence in aggravation against defendant was overwhelming. Therefore, we find that, had this additional information been admitted, there is no reasonable likelihood that the result of defendant's sentencing proceeding would have been different. See *Guest*, 166 Ill. 2d at 409-10 (aggravating evidence presented at sentencing establishes defendant's character much more persuasively than testimony of defendant's relatives and friends); *Mahaffey*, 165 Ill. 2d at 466-67 (testimony of defendant's family and friends was cumulative and would not have outweighed defendant's extensive criminal record).

### Constitutionality of Death Sentence

Defendant next contends that the trial court erred in

dismissing his post-conviction petition without an evidentiary hearing on his claim that his death sentence was unconstitutional. Defendant makes several assertions in support of this claim, arguing that his death sentence is unconstitutional because (1) the sentencing court did not consider defendant's mental impairments; (2) defendant is mentally retarded; and (3) defendant has the mental age of a 13-year-old. Defendant also argues (4) the Illinois death penalty statute is unconstitutional.

### 1. *Consideration of Mental Impairments*

Defendant argues that the evidence he presented with his post-conviction petition demonstrated that he is mentally impaired, was under the influence of an extreme emotional disturbance at the time of the murder, and lacked the capacity to waive his jury for sentencing. Defendant contends that, because the sentencing court did not consider the evidence of his mental condition, his death sentence cannot be the result of the constitutionally guaranteed individualized assessment of mitigating factors. See *Penry v. Lynaugh*, 492 U.S. 302, 106 L. Ed. 2d 256, 109 S. Ct. 2934 (1989); *Eddings v. Oklahoma*, 455 U.S. 104, 71 L. Ed. 2d 1, 102 S. Ct. 869 (1982); *Lockett v. Ohio*, 438 U.S. 586, 57 L. Ed. 2d 973, 98 S. Ct. 2954 (1978). We reject defendant's argument.

The cases defendant relies upon all involved situations where the sentencer either refused or was prevented from considering mitigating evidence in determining the defendant's sentence. See *Penry*, 492 U.S. at 319-20, 106 L. Ed. 2d at 278-79, 109 S. Ct. at 2947 (jury precluded from considering evidence and giving it mitigating effect); *Eddings*, 455 U.S. at 113-14, 71 L. Ed. 2d at 10-11, 102 S. Ct. at 877-76 (sentencing judge refused to consider, as a matter of law, relevant mitigating evidence); *Lockett*, 438 U.S. at 607-08, 57 L. Ed. 2d at 991-92, 98 S. Ct. at 2966 (consideration of mitigating evidence limited to three statutory mitigating factors). The eighth amend-

ment does not, as defendant's argument implies, mandate that defendant or his counsel present every bit of potentially mitigating information. Rather, the eighth amendment "prohibits a State from precluding a sentencing body from considering any potential mitigating evidence presented by the defendant." *People v. Scott*, 148 Ill. 2d 479, 560 (1992); see also *Eddings*, 455 U.S. at 115 n.10, 71 L. Ed. 2d at 11 n.10, 102 S. Ct. at 877 n.10 (*"Lockett* requires the sentencer to listen").

Defendant's contention is comparable to one made by the defendant in *People v. Wright*, 149 Ill. 2d 36, 50-53 (1992). In *Wright*, the defendant, relying upon *Eddings*, argued that his eighth amendment rights were violated because he was sentenced without the benefit of undiscovered reports which would reveal evidence of his troubled youth. This court determined that the proper analysis of defendant's claim was to determine whether he had been prejudiced under the *Strickland* standard. *Wright*, 149 Ill. 2d at 50-51. Because we have already determined that defendant was not prejudiced by any alleged incompetence of his defense counsel at sentencing, this related argument must also fail.

### 2. *Defendant's Mental Retardation*

Defendant next contends that his death sentence is unconstitutional because he is mentally retarded. In support of this contention, defendant cites his IQ of 71 and Dr. Gelbort's diagnosis that defendant suffered from mild mental retardation. Defendant acknowledges that the United States Supreme Court has previously determined that the eighth amendment does not preclude the execution of a mentally retarded defendant convicted of a capital crime (see *Penry*, 492 U.S. at 340, 106 L. Ed. 2d at 292, 109 S. Ct. at 2958). Despite that decision, defendant argues that the "standards of international morality" have now evolved to such a point that the execution of the mentally retarded should now be constitutionally proscribed.

The State argues that defendant has failed to sufficiently establish that he is mentally retarded, observing that even defendant's lowest measured IQ is higher than the upper limit of 70 set for classifying individuals as mentally retarded. See *Penry*, 492 U.S. at 308 n.1, 106 L. Ed. 2d at 271 n.1, 109 S. Ct. at 2941 n.1. Nevertheless, we need not address the State's argument in order to reject defendant's claim.

The *Penry* Court, in 1989, determined that it is not unconstitutional to execute a mentally retarded person who is convicted of a capital crime. In coming to this conclusion, the Court rejected the defendant's claim that there was a national consensus against executing the mentally retarded, finding insufficient objective evidence of such a consensus. *Penry*, 492 U.S. at 333-35, 106 L. Ed. 2d at 288-89, 109 S. Ct. at 2955. The defendant here cites no significant objective evidence beyond that which was found insufficient in *Penry*. Therefore, we do not depart from that decision.

### 3. *Defendant's Mental Age*

Defendant next contends that his death sentence is unconstitutional because he has the "mental age" of only a juvenile. In support, defendant cites Dr. Gelbort's report, which opined that defendant " 'thinks' like a thirteen or fourteen year old." Observing that it has been determined to constitute cruel and unusual punishment to execute a defendant who was under 16 years of age (*Thompson v. Oklahoma*, 487 U.S. 815, 838, 101 L. Ed. 2d 702, 720, 108 S. Ct. 2687, 2700 (1988)), defendant reasons that executing a defendant with a mental age under 16 years of age is also prohibited. We disagree.

Despite defendant's contentions otherwise, the Supreme Court has previously rejected the concept of mental age as a basis for exculpating a defendant from criminal responsibility. See *Penry*, 492 U.S. at 339-40, 106 L. Ed. 2d at 291-92, 109 S. Ct. at 2958 ("mental age

should not be adopted as a line-drawing principle in our Eighth Amendment jurisprudence"). The *Penry* Court noted several limitations of the mental age concept, including that it underestimates the life experiences of mentally retarded adults and that the mental age of the average adult is only that of a 16-year-old. *Penry*, 492 U.S. at 339-40, 106 L. Ed. 2d at 291-92, 109 S. Ct. at 2958. In addition, the *Penry* Court observed that state courts, including this court, have long been reluctant to rely on the mental age concept. *Penry*, 492 U.S. at 339-40, 106 L. Ed. 2d at 292, 109 S. Ct. at 2958, citing *People v. Marquis*, 344 Ill. 261, 267 (1931). Defendant has failed to offer a sound basis why this court should not continue to follow *Penry*.

### 4. *Constitutionality of Illinois Death Penalty Statute*

Defendant's final two arguments challenge the constitutionality of the Illinois death penalty statute (720 ILCS 5/9—1 (West 1994)). First, defendant argues that, because prosecutors are given unfettered discretion to decide in which cases to seek the death penalty, the application of the death penalty leads to irrational and arbitrary results. This particular challenge was also raised by defendant on direct appeal and may not be again considered under the bar of *res judicata*. See *Johnson*, 149 Ill. 2d at 162.

Lastly, defendant argues that the Illinois death penalty statute is unconstitutional because it results in a disproportionate number of death sentences imposed upon African-American defendants who are convicted of murdering white victims. We find this contention waived. Although defendant's direct appeal raised eight challenges to the constitutionality of the death penalty statute, defendant did not raise this particular challenge in that appeal. See *Johnson*, 149 Ill. 2d at 162-64. Defendant may not raise an issue on collateral review which could have been raised previously. *People v. Hampton*,

165 Ill. 2d 472, 480 (1995). Because this question could have been raised on direct appeal, the issue is waived. Moreover, we observe that this particular claim has been repeatedly rejected by this court. See, *e.g.*, *People v. Williams*, 147 Ill. 2d 173, 268-69 (1991); *People v. Orange*, 121 Ill. 2d 364, 392 (1988); *People v. Davis*, 119 Ill. 2d 61, 68 (1987).

## CONCLUSION

For the reasons stated above, we affirm the judgment of the circuit court of Cook County dismissing defendant's amended petition for post-conviction relief. We hereby direct the clerk of this court to enter an order setting Tuesday, November 10, 1998, as the date on which the sentence of death entered by the circuit court of Cook County is to be carried out. The defendant shall be executed in the manner provided by law (725 ILCS 5/119—5 (West 1994)). The clerk of this court shall send a certified copy of the mandate in this case to the Director of Corrections, to the warden of Stateville Correctional Center, and to the warden of the institution where defendant is now confined.

*Affirmed.*