2020 IL App (1st) 170107-U

THIRD DIVISION
September 30, 2020

No. 1-17-0107

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT
_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 05 CR 17618 |
| | ) | |
| CORTEZ SHIELDS, | ) | |
| | ) | Honorable |
| Defendant-Appellant. | ) | Dennis J. Porter, |
| | ) | Judge Presiding. |

_____

JUSTICE McBRIDE delivered the judgment of the court.
Justices Ellis and Burke concurred in the judgment.

**ORDER**

¶ 1    *Held*:  The trial court did not err in its second-stage dismissal of defendant's postconviction petition.

¶ 2    Defendant Cortez Shields appeals the second-stage dismissal of his postconviction petition, arguing that he made a substantial showing of a constitutional violation where his trial counsel failed to act or investigate defendant's fitness to stand trial. Specifically, defendant contends that his petition set forth that his trial counsel was ineffective for failing to investigate defendant's fitness to stand trial because defendant is intellectually disabled with a low IQ and

has impaired reasoning and short and long term memory issues. Defendant also asserts for the first time on appeal that his aggregate sentence of 80 years constitutes an unconstitutional *de facto* life sentence due to his intellectual disability and minimal culpability.

¶ 3    Defendant was indicted on multiple charges, including first degree murder and aggravated battery with a firearm, arising from the shooting of Gregory Boarden and Levelle Hicks in October 2004. Boarden died as a result of his injuries from the shooting.

¶ 4    The following is a summary of evidence presented at defendant's 2008 jury trial taken from this court's decision on defendant's direct appeal.

> "The trial evidence established that on the evening of October 23, 2004, Charles Chris Jones testified that he, Levelle Hicks, and Leotis Wheeler were celebrating Jones's birthday in front of 3540 West Douglas in Chicago when they heard about a party at Trumbull and Douglas. The three men went to the party and stayed until the party ended and Jones and other people went outside. While Jones was engaged in conversation with a woman, defendant made snide remarks. Then Jones was struck above the left eye. He testified at trial he 'kind of figured' it was defendant who struck him. Gregory Boarden came to Jones's assistance. Then gunshots were heard, and Boarden steered Jones away. Jones left the area. He later learned from 'street talk' that defendant was the person who had struck him.

> Levelle Hicks testified that he, Boarden and Leotis Wheeler attended the party at Trumbull and Douglas. After the party ended, Hicks was outside when he heard gunshots. He, Boarden, and Wheeler ran back to the house at 3540 West Douglas. It was then after midnight on October 24. The three men entered Wheeler's auto; Wheeler sat behind the wheel, Boarden sat next to him, and

Hicks sat in the back seat. Wheeler drove to 15th and South Homan where he swerved his car toward a group of people. Wheeler identified one of the people in the group, defendant, as the man who had struck Jones after the party. Someone in the group threw a bottle which shattered against Wheeler's car. Wheeler then drove to 12th Place and Homan where he parked the car. About 10 or 15 minutes later, defendant drove up in his own car. Defendant had a gun in his hand and started shooting. A number of shots were fired as Wheeler drove away. Hicks was shot in the thigh and was hospitalized for two days. [Hicks also testified that Boarden was shot.] The bullet was still lodged in [Hicks's] thigh at the time of trial. In a pretrial photo array and lineup and at trial, Hicks identified defendant as the shooter.

Leotis Wheeler was also called as a State witness at trial but testified he could not recall whether Boarden and Jones were at the party. He denied witnessing an altercation between defendant, Boarden, and Jones and denied hearing gunshots outside the party. He did not recall driving his car to look for defendant to get revenge against defendant for hitting Jones. He did not drive to 15th and Homan and did not recall defendant throwing a bottle at his car at that location. He recalled driving his car to 12th and Homan, but initially he could not remember that Boarden and Hicks were in the car with him. Later, he testified his car was shot up at that location and that Boarden was a passenger in the front seat and Hicks was in the back seat. Wheeler denied seeing who shot at the car and stated he did not see defendant. Both [Boarden and Hicks told Wheeler that] they had been hit by the gunfire and Wheeler drove them to Mount Sinai Hospital.

Wheeler denied signing a form in the presence of a police officer, could not remember making a photo array identification, denied making a lineup identification of defendant, and could not recall testifying before the grand jury.

An assistant State's Attorney testified about Wheeler's testimony before a grand jury in connection with the crimes. Wheeler told the grand jury he was present at the party at Trumbull and Douglas where he saw defendant strike Jones and then saw Boarden and Hicks push defendant. Wheeler saw everyone run and heard gunshots, and Wheeler ran to his car and drove back to 3540 West Douglas where Boarden and Hicks entered the car. When Wheeler and his passengers later saw defendant and others at 15th and Homan, they 'rode up trying to square with them to get out and fight.' Defendant threw a bottle at the car. Wheeler made a U-turn and saw defendant running toward another car. Subsequently, at 12th and Homan, Wheeler saw defendant with a gun in his hand and saw defendant shooting at Wheeler's car. Wheeler also testified before the grand jury that after the shooting he identified a photo of defendant as the shooter and also picked defendant out of a lineup.

The State also introduced tape recordings of telephone conversations at Graham Correctional Center between defendant and his brother, Mario Shields. In one conversation, defendant was heard telling Mario he was going to claim he was not at the party and did not hear about the shootings of Hicks and Boarden until the next day, Detective Tom Crain testified that after defendant was arrested, he stated he had nothing to do with Boarden getting killed and said he was not there. Crain asked defendant if he was going to tell Crain an alibi he devised in a

taped conversation he had with his brother at Graham Correctional Center. Crain

showed defendant the tapes and asked if defendant wanted to hear them.

Defendant started to scream and said he did not want to go to jail; then he began

to cry.

The parties stipulated that a forensic pathologist from the Cook County

Medical Examiner's Office would testify that Gregory Boarden died of multiple

gunshot wounds to the chest. The parties also stipulated that at the hospital hours

after the shooting, Hicks told a police detective that he was unable to give a

description of the offenders.

The defense rested without presenting testimony." *People v. Shields*, No.

1-09-0281, at 1-5 (2010) (unpublished order under Supreme Court Rule 23).

¶ 5 The jury subsequently found defendant guilty of first degree murder and aggravated

battery with a firearm. The jury also found that in committing the murder, defendant personally

discharged a firearm that proximately caused Boarden's death.

¶ 6 In August 2008, defense counsel filed a motion for a new trial. Defendant also filed a

*pro se* motion asking the trial court to reduce the charged offense and raised claims of self-

defense and ineffective assistance of trial counsel for failing to (1) offer a jury instruction for a

lesser offense of manslaughter and (2) investigate defendant's fitness to stand trial due to his

intellectual disability. At the subsequent sentencing hearing, the trial court acknowledged

defendant's *pro se* posttrial motion and asked if the defense counsel and the prosecutor had

received copies. The court then stated that it would not consider defendant's motion, pointing out

that since defendant had an attorney, it was not proper for defendant to file *pro se* motions

regarding legal issues connected to the case. The court also considered and denied defense

counsel's motion for a new trial. The trial court then conducted defendant's sentencing hearing and imposed an aggregate term of 80 years from consecutive sentences of 60 years for first degree murder (35 years plus a 25-year enhancement for personally discharging a firearm that caused a death) and 20 years for aggravated battery with a firearm.

¶ 7     In October 2008, defense counsel filed a motion to reconsider defendant's sentence. In the motion, counsel stated that defendant's *pro se* motion was filed without his knowledge by defendant or someone on defendant's behalf and counsel was not provided a copy. In consultations with defendant's immediate family, counsel had not been informed of "any mental deficiency on the part of the defendant." Prior to sentencing, counsel did not request a behavioral clinic examination (BCX) based on what was known at that time. Following the sentencing hearing, defendant's family tendered defendant's records from Chicago Public Schools to defense counsel. The records indicated that defendant had a disability of educable mentally handicapped (EMH). At a hearing, defense counsel requested a fitness hearing for defendant and the case was continued. Defense counsel stated, "I think to be safe, based on the sentence, my concern is that somewhere down the line there will be a [postconviction] filed, and this allegation will be raised. We might as well deal with it now."

¶ 8     At the next hearing, defense counsel discussed the *pro se* posttrial motions "prepared by one of [defendant's] relatives" and the school reports he later received. Based on the reports that indicated defendant received "special schooling," counsel requested a BCX to determine if defendant is fit for sentencing. In response, the prosecutor argued that defendant's school records indicated that he attended an alternative high school and "the majority of [his] grades [were] adequate or more than adequate." The prosecutor observed that defendant was classified as EMH2, and the school informed the prosecutor that the 2 indicated that defendant was moderate

on a scale of 1 to 4, with 4 being severe. The court asked defense counsel if he had any indication that defendant was unfit for trial, and counsel responded, "I did not. We discussed bench and jury, we discussed what to plead to. We had lengthy discussions about self-defense and provocation." The court ordered a BCX to determine fitness for sentencing.

¶ 9    At a December 2008 hearing, defense counsel informed the trial court that the BCX interview did not take place. The court summarized the examining doctor's report that defendant

> "sat mute and would not respond to any of his questions. Several attempts were made to engage in the defendant's cooperation and evaluation process. However these failed. Because of the defendant's refusal to cooperate in the evaluation process, [he was] unable to enter an opinion on the referral issue."

Defense counsel stated that he spoke with defendant about the nature of the report and defendant told counsel that he did attempt to cooperate but was told to leave. Defendant indicated that he would like to be interviewed. The court asked defendant if he was going to talk to the doctor, and defendant answered, "Yeah." The court admonished defendant that it was up to defendant and he would not be forced to cooperate, but if he was not going to cooperate, then inform the court. Defense counsel then stated to defendant that he had previously told defendant the same thing and asked if defendant wanted to go. Defendant then said, "No." Counsel asked, "You do want to go and you do want to cooperate," and defendant responded, "No." Following this response, the trial court noted that defendant did not want to go and moved on to the motion to reduce sentence, which was denied.

¶ 10    On direct appeal, defendant argued that the trial court erred by failing to conduct an inquiry, pursuant to *People v. Krankel*, 102 Ill.2d 181, 189 (1984), into defendant's claims from his *pro se* posttrial motion that trial counsel was ineffective for failing to offer a jury instruction

7

for a lesser offense and failing to investigate defendant's fitness to stand trial. *Shields*, No. 1-09-0281, at 1. The reviewing court affirmed defendant's conviction and concluded that a *Krankel* hearing was not required for either claim. In regard to the fitness issue, the appellate court observed that "defendant was provided the opportunity to establish his conclusory allegation that he suffered from a learning disability preventing him from comprehending the court proceedings, but he refused to cooperate with a BCX." *Id.* at 13. The court also noted that the *pro se* motion "undercut[]" defendant's claim because it "establishe[d] defendant suffered from no disability impeding his comprehension of what occurred in court." *Id.* at 13-14.

¶ 11    In January 2012, defendant filed his *pro se* postconviction petition alleging ineffective assistance of trial counsel for (1) failing to investigate and present defendant's theory of the case; (2) disregarding defendant's wish for a bench trial; (3) failing to investigate defendant's fitness to stand trial and "present readily available evidence"; and (4) failing to investigate the transcripts of a recorded telephone call. He also alleged ineffective assistance of his appellate counsel for failing to raise meritorious issues from the motion for a new trial on direct appeal. Defendant attached an unsigned affidavit from Antenette Hunter in which she stated that she spoke with defense counsel prior to trial and told counsel that defendant was intellectually disabled and did not "understand what's going on in Court, and he usually behaves as he understands what being said [*sic*] even when he don't. [*Sic*.]" He also attached an unsigned affidavit from his brother Itez Shields and a signed affidavit from his brother Curtis Shields. Both affidavits related to the circumstances of the shooting. Defendant further attached portions of the report of proceedings from the trial.

¶ 12    In March 2012, defendant filed a petition to supplement the record with defendant's affidavit, in which defendant stated, in relevant part, that defense counsel "was provided by

Elizabeth Shields the transcript from Chicago Public Schools indicating that affiant was diagnosed, and his diagnosis would bear on whether he was fit to stand trial." On March 14, 2012, the trial court docketed defendant's postconviction petition and appointed the public defender to represent defendant.

¶ 13    In January 2016, defendant, through postconviction counsel, filed a supplemental postconviction petition and reasserted defendant's fitness claims. Specifically, defendant argued that (1) he was denied due process when he was prosecuted despite not being fit for trial and (2) his trial counsel was ineffective for failing to investigate defendant's mental capabilities at the time of the trial where defendant's family members informed counsel of defendant's intellectual disabilities and several records of this disability were available. The supplemental petition also claimed ineffective assistance of appellate counsel for improperly referring to defendant's *pro se* posttrial motion as having been prepared by defendant and the misunderstanding significantly prejudiced defendant's appellate claims. In support, the supplemental petition attached 16 exhibits. One of these exhibits was a 2014 report from Dr. Fred Klug, a clinical psychologist, finding defendant was not competent to stand trial in 2008. In his report, Dr. Klug based his opinion on defendant's intellectual functioning, defendant "was not able to understand the legal process and was not able to effectively assist in his defense." Dr. Klug further concluded that defendant was not competent to stand trial at the time of his evaluation and would not be able to become competent within the statutory time frame. The report detailed Dr. Klug's findings that defendant had impaired short term memory, "marginal" long term memory, poor reasoning and abstract thinking, inability to read above the third grade level, and a full scale IQ of 46. Dr. Klug also opined that he did not believe defendant was malingering.

¶ 14    The petition also included an affidavit from Antwainetta Hunter stating that she has known defendant since he was a child and knew he had "difficulties learning" and was placed in "special education classes." She further stated that defendant received social security benefits due to his intellectual disabilities. Hunter said she attended defendant's trial and talked to trial counsel about defendant's mental disabilities.

¶ 15    The additional exhibits included Chicago public school records, records from Hartgrove Hospital from defendant's admission at age 13 in 1997, a Cook County juvenile court fitness evaluation from 1996, and juvenile court social investigations from 1997 and 1999.

¶ 16    In August 2016, the State moved to dismiss defendant's postconviction petition arguing that defendant failed to satisfy his burden for ineffective assistance of trial counsel under the standard from *Strickland v. Washington*, 466 U.S. 668 (1984), and that defendant was not denied due process. Specifically, the State contended that the record does not support defendant's claims because trial counsel did not doubt defendant's fitness, but still requested the BCX after defendant's *pro se* posttrial motion and there was no *bona fide* doubt regarding defendant's mental fitness. The State also asserted that defendant's claims were barred by *res judicata* and waiver. According to the State, defendant's "claim of denial of due process and ineffective assistance of counsel based on his fitness to stand trial were explored and rejected on appeal." Further, the State contended that defendant could have raised claims of ineffective assistance of trial counsel for failing to conduct a pretrial fitness evaluation on direct appeal.

¶ 17    In November 2016, defendant filed his response to the State's motion to dismiss. Defendant asserted that the application of *res judicata* was misplaced because the issues raised in his postconviction were not raised on direct appeal and waiver cannot apply because he claimed

his appellate counsel was ineffective. Defendant contended that Dr. Klug's report established a *bona fide* doubt regarding defendant's fitness to stand trial.

¶ 18    Following a hearing in December 2016, the trial court granted the State's motion to dismiss defendant's postconviction petition. In its ruling, the court noted that "normally in a vacuum" having a psychologist's report indicating a person was not fit seven years earlier would be enough to merit a third stage evidentiary hearing, but the record did not support defendant's claim. The court then discussed the evidence in the record in which defendant was recorded in conversation with his brother and found those recordings "clearly" indicated that defendant "understood the nature of the charges against him really well so he tried to manufacture an alibi, a spurious alibi." The court also acknowledged that while it did not have the "most personal contact with the defendant" as in some trials, the court "noticed nothing unusual about the defendant's actions or appearances during the trial," which prompted the court to ask trial counsel about a basis for the BCX request. The court recounted trial counsel's notification that he had no issue communicating with defendant, but wanted the BCX conducted because of a complaint from family members. The court "faile[d] to see how under those set of circumstances [counsel] can be ineffective for I guess not thinking the guy might be unfit when everything indicate[d] that he [was] fit." The court further observed that the State "may well be right, it may well be a case of res judicata actually." The court concluded that defendant failed to make a substantial showing.

¶ 19    This appeal followed.

¶ 20    The Illinois Post-Conviction Hearing Act (Post-Conviction Act) (725 ILCS 5/122-1 through 122-8 (West 2016)) provides a tool by which those under criminal sentence in this state can assert that their convictions were the result of a substantial denial of their rights under the

11

United States Constitution or the Illinois Constitution or both. 725 ILCS 5/122-1(a) (West 2016); *People v. Coleman*, 183 Ill. 2d 366, 378-79 (1998). Postconviction relief is limited to constitutional deprivations that occurred at the original trial. *Coleman*, 183 Ill. 2d at 380. "A proceeding brought under the [Post-Conviction Act] is not an appeal of a defendant's underlying judgment. Rather, it is a collateral attack on the judgment." *People v. Evans*, 186 Ill. 2d 83, 89 (1999). "The purpose of [a postconviction] proceeding is to allow inquiry into constitutional issues relating to the conviction or sentence that were not, and could not have been, determined on direct appeal." *People v. Barrow*, 195 Ill. 2d 506, 519 (2001). Thus, *res judicata* bars consideration of issues that were raised and decided on direct appeal, and issues that could have been presented on direct appeal, but were not, are considered forfeited. *People v. Blair*, 215 Ill. 2d 427, 443-47 (2005).

¶ 21 At the first stage, the circuit court must independently review the postconviction petition within 90 days of its filing and determine whether "the petition is frivolous or is patently without merit." 725 ILCS 5/122-2.1(a)(2) (West 2016). If the circuit court does not dismiss the postconviction petition as frivolous or patently without merit, then the petition advances to the second stage. Counsel is appointed to represent the defendant, if necessary (725 ILCS 5/122-4 (West 2016)), and the State is allowed to file responsive pleadings (725 ILCS 5/122-5 (West 2016)). At this stage, the circuit court must determine whether the petition and any accompanying documentation make a substantial showing of a constitutional violation. See *Coleman*, 183 Ill. 2d at 381. If no such showing is made, the petition is dismissed. "At the second stage of proceedings, all well-pleaded facts that are not positively rebutted by the trial record are to be taken as true, and, in the event the circuit court dismisses the petition at that stage, we generally review the circuit court's decision using a *de novo* standard." *People v. Pendleton*, 223 Ill. 2d 458, 473 (2006). If,

however, a substantial showing of a constitutional violation is set forth, then the petition is advanced to the third stage, where the circuit court conducts an evidentiary hearing. 725 ILCS 5/122-6 (West 2016). "Only those claims in which a substantial showing has been made entitle the defendant to an evidentiary hearing." *People v. Cleveland*, 2012 IL App (1st) 101631, ¶ 55 (citing *People v. Lara*, 317 Ill. App. 3d 905, 908 (2000)).

¶ 22     On appeal, defendant argues his petition made a substantial showing that his trial counsel was ineffective for failing to investigate defendant's fitness to stand trial or to request a fitness hearing when counsel should have known there was a *bona fide* doubt as to defendant's fitness. Defendant asserts that trial counsel had numerous indications that defendant was not fit, but took no action to investigate defendant's fitness.

¶ 23     Claims of ineffective assistance of counsel are resolved under the standard set forth in *Strickland v. Washington*, 466 U.S. 668 (1984).  In *Strickland*, the Supreme Court delineated a two-part test to use when evaluating whether a defendant was denied the effective assistance of counsel in violation of the sixth amendment. Under *Strickland*, a defendant must demonstrate that counsel's performance was deficient and that such deficient performance substantially prejudiced defendant.  *Strickland*, 466 U.S. at 687. To demonstrate performance deficiency, a defendant must establish that counsel's performance fell below an objective standard of reasonableness.  *People v. Edwards*, 195 Ill. 2d 142, 163 (2001). "A defendant is entitled to reasonable, not perfect, representation, and mistakes in strategy or in judgment do not, of themselves, render the representation incompetent." *People v. Fuller*, 205 Ill. 2d 308, 331 (2002). "Counsel's strategic choices are virtually unchallengeable. Thus, the fact that another attorney might have pursued a different strategy, or that the strategy chosen by counsel has

ultimately proved unsuccessful, does not establish a denial of the effective assistance of counsel." *Id*.

¶ 24    In evaluating sufficient prejudice, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694.  If a case may be disposed of on the ground of lack of sufficient prejudice, that course should be taken, and the court need not ever consider the quality of the attorney's performance. *Strickland*, 466 U.S. at 697. "*Strickland* requires actual prejudice be shown, not mere speculation as to prejudice." *People v. Bew*, 228 Ill. 2d 122, 135 (2008).

¶ 25    In response, the State contends that defendant's ineffective assistance claim is subject to invited error because defendant refused to participate when a BCX evaluation was ordered in the trial court. The State also maintains that the claim is barred by the doctrine of *res judicata* because defendant raised the same allegations in his direct appeal. In his reply, defendant incorrectly contends that the State failed to raise *res judicata* before the trial court, but the State's motion to dismiss defendant's postconviction petition raised *res judicata* and the trial court acknowledged the argument in its ruling.

¶ 26    " '[I]ssues that were raised and decided on direct appeal are barred from consideration by the doctrine of *res judicata*; issues that could have been raised, but were not, are considered waived.' " *People v. Allen*, 2015 IL 113135, ¶ 20 (quoting *People v. Pitsonbarger*, 205 Ill. 2d 444, 456 (2002)). "With ineffective-assistance-of-counsel claims, our supreme court has also applied *res judicata* when the issue of ineffectiveness of trial counsel has already been addressed on direct appeal and the postconviction petition added 'somewhat different allegations of incompetence.' " *People v. Snow*, 2012 IL App (4th) 110415, ¶ 30 (quoting *People v.*

14

*Albanese,* 125 Ill. 2d 100, 105 (1988)). After reviewing the record on appeal, we find that defendant's claim is barred by *res judicata*.

¶ 27    The core of defendant's postconviction petition, *i.e.*, his trial counsel was ineffective for failing to investigate defendant's fitness to stand trial, was raised and decided on direct appeal. One of the exhibits to defendant's supplemental postconviction petition was a portion of defendant's appellate brief. In the brief, defendant argued that the record supported defendant's "allegations that his counsel was ineffective for failing to investigate the fact that he may have been unfit at the time of trial, information known to his trial counsel." Specifically, "defense counsel may be found to be ineffective where there is a *bona fide* doubt of defendant's fitness and counsel fails to request a fitness hearing." Defendant contended that, trial counsel noted at the sentencing hearing that "the presentence investigation [PSI] report indicated that when [defendant] was 13-years-old, he was placed in a mental health facility" because defendant was " 'seeing and hearing things.' " Defendant further asserted:

>    "While [defendant] refused to cooperate in the evaluation process, the record shows no effort by trial counsel to investigate [defendant's] fitness at the time of trial or sentencing, and no request by counsel for a fitness hearing regarding [defendant's] fitness to stand trial. Thus, according to [defendant], although there was support that he was unfit during the entire trial proceedings, his counsel never investigated this allegation or requested a hearing to determine [defendant's] fitness to proceed with trial, in addition to sentencing."

¶ 28    The reviewing court on direct appeal considered and rejected defendant's claim.

>    "The crux of defendant's *pro se* motion was that his learning disability prevented him from understanding what had occurred in court. However,

15

defendant's further assertion--that someone named Irene Hunter informed defendant's trial counsel that defendant was 'retarded' and did not understand what was taking place in court--was contradicted by counsel's denial of any knowledge of defendant's inability to understand or assist in his defense. An EMH2 notation, indicating a moderate degree of 'educable mentally handicapped,' appeared in defendant's 2002 school record only in one semester where he had a degree of difficulty in learning. Nevertheless, further examination of the factual basis of defendant's claim was afforded when the BCX was ordered which could have determined whether defendant did have a learning disability sufficient to have prevented him from understanding the court proceedings. However, no *Krankel* inquiry is mandated where the allegations of ineffective counsel are merely conclusory on their face and defendant provides no detail when afforded the opportunity. *People v. Bolton*, 382 Ill. App. 3d 714, 720 (2008). Here, defendant was provided the opportunity to establish his conclusory allegation that he suffered from a learning disability preventing him from comprehending the court proceedings, but he refused to cooperate with a BCX." *Shields*, No. 1-09-0281, at 13.

¶ 29    This is the same argument raised in this appeal. Since this court has already decided that defendant's ineffective assistance claims lacked merit and the trial court did not err in finding that defendant's ineffective assistance of counsel claim was baseless, defendant's claim is barred by *res judicata*. See *People v. Johnson*, 2016 IL App (5th) 130554, ¶¶ 31-32 (finding that the defendant's postconviction ineffective assistance claim was barred by *res judicata*, to the extent that defendant's allegations had already been considered by the trial court during a *Krankel*

hearing, and also by the appellate court on direct appeal). "A post-conviction petitioner may not avoid the bar of *res judicata* simply by rephrasing, as defendant has done in this case, issues previously addressed on direct appeal." *People v. Simpson*, 204 Ill. 2d 536, 559 (2001).

¶ 30     Nevertheless, defendant contends that the bar of *res judicata* has been overcome under two arguments: (1) his petition contains new facts which were not available at the time defendant made his *pro se* motion in the trial court; and (2) independent of his ineffective assistance claim, his right to due process was violated because he stood trial despite being unfit. However, the question presented in both arguments is whether a *bona fide* doubt existed regarding defendant's fitness to stand trial.

¶ 31     Due process bars the prosecution of an unfit defendant. *People v. Hanson*, 212 Ill. 2d 212, 216 (2004). A defendant is unfit to stand trial if, due to a mental or physical condition, he or she is unable to understand the nature and purpose of the proceedings or to assist in the defense. *People v. Brown*, 236 Ill. 2d 175, 186 (2010); 725 ILCS 5/104-10 (West 2016). The issue of the defendant's fitness for trial, or to be sentenced may be raised by the defense, the State, or the Court at any appropriate time before, during, or after trial. 725 ILCS 5/114-11(a) (West 2016). The trial court must order a fitness hearing if a *bona fide* doubt is raised of the defendant's fitness. *Brown*, 236 Ill. 2d at 186; 725 ILCS 5/114-11(a) (West 2016).

¶ 32     Relevant factors which a trial court may consider in assessing whether a *bona fide* doubt of fitness exists include (1) the defendant's irrational behavior, (2) the defendant's demeanor at trial, (3) any prior medical opinion on the defendant's competence, and (4) any representations by defense counsel on the defendant's competence. *Id*. at 186-87 (citing *People v. Eddmonds*, 143 Ill. 2d 501, 518 (1991)). "No fixed or immutable sign, however, invariably indicates the need for further inquiry on a defendant's fitness." *Id*. at 187 (citing *Eddmonds*, 143 Ill. 2d at

518). Rather, the question is "often a difficult one implicating a wide range of manifestations and subtle nuances." *Id*. A *bona fide* doubt arises where there are facts in existence that raise a "real, substantial and legitimate doubt as to [defendant's] mental capacity to meaningfully participate in his defense and cooperate with counsel." *Eddmonds*, 143 Ill. 2d at 518. "A defendant's limited intellectual ability, without more, does not render him unfit to stand trial." *Johnson*, 183 Ill. 2d at 194.

¶ 33     Defendant contends that Dr. Klug's evaluation and his medical records establish that a *bona fide* doubt existed. Defendant primarily relies on *People v. Murphy*, 160 Ill. App. 3d 781 (1987), to support his argument. There, the defendant's bench trial had already begun when he attempted suicide while incarcerated in the residential treatment unit of the Cook County Department of Corrections. *Id*. at 783. His trial counsel then moved for a BCX to determine defendant's fitness to stand trial. *Id*. At the fitness hearing, the defendant's mother testified defendant had previously been hospitalized in a psychiatric ward in California for two years after slashing his wrists. Trial counsel argued during closing that there was a *bona fide* doubt of the defendant's fitness to stand trial, and that he thought it was important that the defendant had been in the residential treatment unit. *Id*. at 784. Counsel also encountered difficulties in communicating with the defendant about his case, and he realized there was a "problem" with defendant. *Id*. The trial court found the defendant fit to stand trial, citing its failure to observe, or of any party to bring to its attention, any evidence that the defendant was unwilling to cooperate or unfit to stand trial before it commenced. *Id*.

¶ 34     On direct appeal, the defendant argued that he was denied effective assistance of counsel due to his trial counsel's failure to investigate his mental condition or obtain records of his prior hospitalizations before his trial or his suicide attempt. *Id*. at 785. He further argued that sufficient

prejudice was shown since proper investigation might have resulted in an insanity defense and a different trial result. *Id.*

¶ 35    The reviewing court found defense counsel's failure to investigate manifestly unreasonable, noting that counsel had "sufficient facts within his knowledge" to warrant some investigation into defendant's psychiatric history. *Id.* at 789. Based on this, the court believed that "defense counsel was required to investigate, at minimum, the nature of defendant's immediately perceptible problems and, if warranted by that investigation, to investigate his psychiatric history in depth." *Id.* The *Murphy* court concluded that prejudice had been established because "the outcome of the fitness hearing *may have* been different had defense counsel investigated defendant's mental condition and history and because such investigation *may have* led him to assert an insanity defense at trial." (Emphasis added.) *Id.* at 790.

¶ 36    Here, in contrast, defense counsel never indicated that he had concerns regarding defendant's fitness. Rather, the opposite occurred here where counsel stated on the record that he never had any indication that defendant was unfit and had multiple discussions with defendant regarding what to plead, whether to have a bench or jury trial, and the potential affirmative defense of self-defense and provocation. Further, defendant's prior hospitalization had occurred more than seven years before the offense was committed when defendant was 13 years old. While defendant repeatedly refers to a suicide attempt while in jail, the only reference to this in the record is in Dr. Klug's report, in which defendant reported that he set his cell on fire in 2007.

¶ 37    Moreover, as the State points out, the standard used in *Murphy* has been called into doubt by another appellate district. The Fourth District observed that "the standard used by the appellate court in determining whether the client was prejudiced by counsel's failure seemed to be less stringent than the 'reasonable probability' of success standard of *Strickland.*" *People v.*

*Thompson*, 166 Ill. App. 3d 909, 914 (1988). As quoted above, the *Murphy* court based its prejudice finding on whether the outcome of the fitness hearing "may have" been different if counsel had investigated the defendant's mental condition. *Murphy*, 160 Ill. App. 3d at 790. We agree with the *Thompson* court, this standard does not comport with *Strickland* where a defendant must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Strickland*, 466 U.S. at 694.

¶ 38    Defendant also cites *People v. Easley*, 192 Ill. 2d 307 (2000), in support of his contention that a *bona fide* doubt existed. However, his reliance on *Easley* is misplaced and instead supports a finding that defendant failed to make a substantial showing that a *bona fide* doubt existed as to his fitness to stand trial.

¶ 39    In *Easley*, the defendant appealed the trial court's dismissal of his postconviction petition without an evidentiary hearing. Similar to defendant here, one of the issues raised by the defendant was whether his trial counsel was ineffective for failing to request a fitness hearing. *Id*. at 318. The State initially argued that defendant had forfeited the claim by not raising it on direct appeal, but the supreme court disagreed, noting that the "defendant now presents evidence that did not appear on the face of the record and was not available to defense counsel on direct appeal." *Id*. The supreme court observed that

> "to establish that his trial counsel's alleged incompetency prejudiced him within the meaning of *Strickland,* defendant must show that facts existed at the time of his trial that would have raised a *bona fide* doubt of his ability to understand the nature and purpose of the proceedings and to assist in his defense. Defendant is entitled to relief on this post-conviction claim only if he shows that the trial court

would have found a *bona fide* doubt of his fitness and ordered a fitness hearing if it had been apprised of the evidence now offered." *Id*. at 318-19.

¶ 40    "Since defendant's post-conviction petition was dismissed without an evidentiary hearing, '[t]he critical inquiry is whether the facts presented in defendant's post-conviction petition raised a *bona fide* doubt of his fitness to stand trial.' " *Id*. (quoting *People v. Johnson*, 183 Ill. 2d 176, 193 (1998)).

¶ 41    After considering the relevant factors, the *Easley* court found that the defendant's evidence failed to raise a *bona fide* doubt as to his fitness. In that case, defense counsel arranged for a psychologist to evaluate the defendant as mitigation evidence at sentencing, but counsel failed to inform the defendant. The defendant believed the State had sent the psychologist and refused to cooperate. *Id*. at 319-20. In an affidavit, the defendant averred that he would have cooperated if he knew his attorney had sent the psychologist. He also stated that he had " 'a lot of headaches' " and believed that something was " 'wrong' " with his brain. *Id*. at 320. "When defendant read or spoke, he forgot everything that he was reading or thinking." *Id*. The supreme court found this evidence did not help the defendant because "[f]itness speaks only to a person's ability to function within the context of a trial. It does not refer to sanity or competence in other areas. A defendant can be fit for trial although his or her mind may be otherwise unsound." *Id*.

¶ 42    The court also noted that while the defendant made some irrational comments during the trial, the comments were not based on his fitness, but rather, the defendant's belief that the "criminal justice system demeaned him." *Id*. at 321-22. Significantly, the supreme court declined to find a *bona fide* doubt as to the defendant's fitness based on a psychologist report prepared six year after trial and procured by postconviction counsel.

"These examinations indicate that defendant had long-standing mental problems at the time of trial that affected his ability to understand written and oral instructions. When under extreme stress, defendant suffered from thought and personality disorder, paranoia, and episodic breaks with reality. Affidavits from defendant's mitigation witnesses accord with this diagnosis." *Id*. at 322.

The court observed that while they take as true the report of the defendant's mental impairments, "that does not necessarily mean that he was unfit for trial. The issue is not mental illness, but whether defendant could understand the proceedings against him and cooperate with counsel in his defense. If so, then, regardless of mental illness, defendant will be deemed fit to stand trial." *Id*. at 322-23.

¶ 43    Similar to *Easley*, defense counsel requested a fitness evaluation, but defendant refused to cooperate. In his postconviction proceedings, defendant presented the report from Dr. Klug, prepared six years after defendant's trial, finding defendant was not fit at the time of trial. However, defendant has not discussed the factors for a *bona fide* doubt as set forth by the supreme court and applied in *Easley*. Defendant's only discussion of these factors is in response to the State's citation and argument. Defendant uses the terms "irrational behavior" and "demeanor" in quotations, but does not acknowledge that the terms arose from supreme court authority. Defendant contends that these terms are "irrelevant" because defendant's "impairment is not of the nature that he would show irrational behavior" and trial counsel failed to perceive defendant's "mental impediments" in defendant's demeanor. Instead, defendant relies on Dr. Klug's report to offer the conclusion that defendant was unfit at the time of trial and a *bona fide* doubt existed as to his fitness at the time of trial.

¶ 44    Illinois Supreme Court Rule 341(h)(7) requires an appellant to include in its brief an

"[a]rgument, which shall contain the contentions of the appellant and the reasons therefor, with

citation of the authorities and the pages of the record relied on." Ill. S. Ct. R. 341(h)(7) (eff. July

1, 2008). It is well-settled that a contention that is supported by some argument but does not cite

any authority does not satisfy the requirements of Rule 341(h)(7), and bare contentions that fail

to cite any authority do not merit consideration on appeal. *Wasleff v. Dever*, 194 Ill. App. 3d 147,

155-56 (1990). Arguments unsupported by citation to relevant legal authority are considered as

forfeited on appeal. *Id*. Since defendant failed to cite relevant authority regarding the

consideration of a *bona fide* doubt as to his fitness and offer argument as to those factors, we find

his claim to have been forfeited on appeal.

¶ 45    Forfeiture aside, defendant cannot succeed on the merits of establishing a *bona fide* doubt

regarding his fitness at the time of the trial. None of the factors set forth by the supreme court

support a finding of a *bona fide* doubt as to defendant's fitness.

¶ 46    As discussed above, defendant does not dispute that he did not engage in irrational

behavior, nor did defendant's demeanor at trial signal a concern with defendant's fitness. Both

defense counsel and the trial judge stated on the record that neither had an indication that

defendant was not competent. When trial counsel requested a BCX during posttrial proceedings,

the trial judge asked defense counsel if he had any indication that defendant was unfit for trial,

and counsel responded, "I did not. We discussed bench and jury, we discussed what to plead to.

We had lengthy discussions about self-defense and provocation." Similarly, during

postconviction proceedings, the trial judge, who also presided over defendant's trial, stated that

while it did not have the "most personal contact with the defendant" as in some trials, the judge

"noticed nothing unusual about the defendant's actions or appearances during the trial," which

prompted the court to ask trial counsel about a basis for the BCX request. The judge continued, "When he asked for that, I asked, 'Do you have any basis for that.' Because I certainly didn't see any, and that's what prompted me to ask." The judge further stated, "I fail to see how under those set of circumstances he can be ineffective for I guess not thinking the guy might be unfit when everything indicates that he is fit." The court also noted that defendant was able to fabricate an alibi based on the admission of phone records of a conversation between defendant and his brother Mario.

¶ 47     Defendant's medical records are not sufficient to establish that a *bona fide* doubt as to defendant's fitness existed at the time of his trial. The medical records included with the petition consist mostly of documents from defendant's placement in Hartgrove Hospital in 1997 when defendant was 13. Defendant also included a competency evaluation from 1996 when defendant, age 13, was charged with armed robbery. The evaluation found defendant not competent to stand trial. The report noted that defendant had been found not competent to stand trial two years earlier when he was charged with residential burglary. No records were included for the prior competency finding. Additional juvenile court social investigations were included from 1997 and 1999. The investigation from 1997 was part of the armed robbery case in which defendant was ultimately found delinquent and placed on probation for five years. The 1999 investigation arose from an arrest for possession of a controlled substance. Defendant was found delinquent and according to defendant's PSI, he was committed to the Department of Corrections. Both cases were included in defendant's PSI in the initial trial proceedings. Similarly, as noted above, defendant's admission to Hartgrove Hospital was disclosed in the trial court. We further point out that, in addition to defendant's juvenile delinquency cases, his PSI listed five prior criminal dispositions. Defendant was previously convicted on charges of possession of narcotics,

possession of cannabis, soliciting unlawful business, possession of a controlled substance, and battery causing bodily harm. There was no indication in defendant's PSI that defendant was not fit for the proceedings in these cases. Since the bulk of the records relate to defendant's criminal activity as a 13-year-old juvenile in which he was later found competent and occurred more than seven years prior to the crimes in this case, these records fail to create a *bona fide* doubt in defendant's fitness as an adult. Because there is nothing in the record to suggest a *bona fide* doubt existed at the time of trial, defendant's due process claim fails.

¶ 48     Moreover, even if we considered defendant's ineffective assistance of counsel claim on the merits, defendant has failed to set forth a substantial showing that his attorney was ineffective under the *Strickland* test. As previously discussed, trial counsel stated on the record that he had no indication that defendant was not fit. Counsel was able to discuss critical decisions for the case with defendant, including whether to have a jury trial, what to plead, and a possible defense of self-defense. Nevertheless, when counsel reviewed defendant's *pro se* motion asserting defendant's lack of fitness, counsel requested a BCX "in an abundance of caution and common sense." However, defendant refused to participate in the evaluation and instead he "sat mute and would not respond to any of his questions. Several attempts were made to engage in the defendant's cooperation and evaluation process." Defendant again relies on Dr. Klug's report which criticized the evaluation for failing to "establish the necessary rapport" with defendant. Defendant argues that his attorney should have been "skeptical" of the evaluation report and should have investigated further. We reject defendant's argument and find that his trial counsel's performance was not deficient. Defense counsel had no indication that defendant was unable to participate in the trial when counsel stated that defendant cooperated with him at trial. Counsel cannot be deficient for failing to request a BCX when such a request was made before the trial

court and defendant declined to participate. Further, it needs no citation that defense counsel cannot be faulted for failing to present Dr. Klug's report when such report did not exist at the time of trial and defendant himself impeded the ability for such an evaluation to take place.

¶ 49    Defendant also cannot satisfy the prejudice prong under *Strickland*. He argues that prejudice was established because there was a *bona fide* doubt as to his fitness at the time of trial. However, as considered above, the record fails to show that a *bona fide* doubt existed at the time trial. Thus, defendant cannot make a substantial showing of prejudice such that there is a reasonable probability that the result of the proceeding would have been different.

¶ 50    Additionally, we need not address defendant's claim that the trial court's reasoning was flawed in granting the State's motion to dismiss defendant's petition. As previously stated, we review the dismissal *de novo*. *Pendleton*, 223 Ill. 2d at 473. "Under the *de novo* standard of review, the reviewing court does not need to defer to the trial court's judgment or reasoning." *People v. Anderson*, 2012 IL App (1st) 103288, ¶ 34. "*De novo* review is completely independent of the trial court's decision." *Id*. We may affirm on any basis found in the record. *People v. Walker*, 2018 IL App (1st) 160509, ¶ 23. Since our review is independent of the trial court, we need not consider whether the trial court's reasoning was correct.

¶ 51    Next, defendant asserts that his 80-year sentence violates the eighth amendment of the United States Constitution (U.S. Const., amend. VIII) and the proportionate penalties clause of the Illinois Constitution of 1970 (Ill. Const. 1970, art. I, § 11) as applied to him because he is intellectually disabled and his *de facto* natural life sentence shocks the moral conscience of the community. Defendant concedes that he failed to raise this issue in his postconviction petition, but maintains that this court can still consider the issue. The State responds that this claim has been forfeited.

¶ 52    Generally, Illinois courts have held that a claim not raised in the postconviction petition cannot be raised for the first time on appeal.  See *Pendleton*, 223 Ill. 2d at 475; *People v. Jones*, 213 Ill. 2d 498, 505 (2004). Section 122-2 of the Post-Conviction Act specifically provides that "the petition shall *** clearly set forth the respect in which petitioner's constitutional rights were violated," and, section 122-3 provides that "[a]ny claim of substantial denial of constitutional rights not raised in the original or amended petition is waived" (725 ILCS 5/122-2 (West 2016); 725 ILCS 5/122-3 (West 2016)). While our supreme court may relax the forfeiture rule by invoking its supervisory power, this court "is not free, *** to excuse, in the context of postconviction proceedings, an appellate waiver caused by the failure of a defendant to include issues in his or her postconviction petition." *Jones*, 213 Ill. 2d at 508.

¶ 53    In *People v. Thompson*, 2015 IL 118151, the supreme court determined that although facial challenges to statutes may be raised at any time, as-applied constitutional challenges are dependent on particular facts and circumstances of the individual defendant and it is therefore "paramount that the record be sufficiently developed in terms of those facts and circumstances for purposes of appellate review." *Id.* ¶ 37. " ' "A court is not capable of making an 'as applied' determination of unconstitutionality when there has been no evidentiary hearing and no findings of fact. [Citation.] Without an evidentiary record, any finding that a statute is unconstitutional 'as applied' is premature." ' " *People v. Rizzo*, 2016 IL 118599, ¶ 26 (quoting *People v. Mosley*, 2015 IL 115872, ¶ 47, quoting *In re Parentage of John M.*, 212 Ill. 2d 253, 268 (2004)).

¶ 54    Because defendant's challenge of his sentence was raised for the first time on appeal, no hearing has been conducted. Nevertheless, defendant contends his claim can be reviewed because it fits within a narrow exception for an as-applied challenge when there is a sufficiently developed record. *People v. Harris*, 2018 IL 121932, ¶¶ 39-43 (citing *People v. Holman*, 2017 IL

120655, ¶ 32). Specifically, defendant maintains that the record is sufficiently developed because "it contains his medical history, medical diagnosis, the record of the events at trial, potential witness testimony, and other evidence establishing his disability." However, no witness testimony, including defendant's own testimony, regarding defendant's intellectual disability exists because no evidentiary hearing has been held.

¶ 55    The supreme court noted in *Harris*,

> "All as-applied constitutional challenges are, by definition, dependent on the specific facts and circumstances of the person raising the challenge. Therefore, it is paramount that the record be sufficiently developed in terms of those facts and circumstances for purposes of appellate review." *Harris*, 2018 IL 121932, ¶ 39.

¶ 56    The *Harris* court further reasoned,

> "The critical point is not whether the claim is raised on collateral review or direct review, but whether the record has been developed sufficiently to address the defendant's constitutional claim. As we have emphasized, a reviewing court is not capable of making an as-applied finding of unconstitutionality in the 'factual vacuum' created by the absence of an evidentiary hearing and findings of fact by the trial court." *Id.* ¶ 41.

¶ 57    Without an evidentiary hearing, specifically including witness testimony, as well as a trial court's findings, we conclude that the record before us has not been sufficiently developed to consider defendant's as-applied challenge on appeal.

¶ 58    Even if we found the record was sufficient to address defendant's claims, which we do not find, the primary authority relied on by defendant, *People v. Coty*, 2018 IL App (1st) 162383,

was recently reversed by the Illinois Supreme Court after this case was fully briefed. *People v. Coty*, 2020 IL 123972.

¶ 59    Defendant argued that under the appellate decision in *Coty*, "the intellectually disabled should be treated similarly to juveniles, prohibiting *de facto* life sentences without appropriate protections. This is because intellectually disabled persons, similar to juveniles, have diminished capacity to understand information, communicate, abstract, learn from mistakes, use logical reasoning, control impulses, and to understand others' reactions."

¶ 60    The decision in *Coty* followed two decisions from the United States Supreme Court. In *Miller v. Alabama*, 567 U.S. 460, 479 (2012), the Supreme Court held that the eighth amendment to the United States Constitution "forbids a sentencing scheme that mandates life in prison without possibility of parole for juvenile offenders." Before sentencing a juvenile offender to life in prison, the sentencing judge must have the opportunity to consider mitigating factors such as, the juvenile's age, the juvenile's family and home environment, the effects of familial or peer pressure, and the possibility of rehabilitation. *Id*. at 477-78. In *Atkins v. Virginia*, 536 U.S. 304, 318 (2002), the Supreme Court, in the context of capital punishment for an intellectually disabled defendant, determined that an intellectually disabled person's culpability is lessened by reason of a diminished capacity (1) to understand and process information, (2) to communicate, (3) to abstract from mistakes and learn from experience, (4) to engage in logical reasoning, (5) to control impulses, and (6) to understand others' actions and reactions, so as to be more susceptible to manipulation and pressure. The Supreme Court concluded those characteristics resulted in reduced culpability and precluded a sentence of death. *Id*. at 320

¶ 61    In *Coty*, the appellate court had "concluded that the imposition of a 50-year *de facto* life sentence on [an intellectually disabled defendant], without the procedural safeguards of *Atkins*,

***, *Miller***, and its progeny, was a penalty so wholly disproportionate that it violated the moral sense of our community." *Coty*, 2020 IL 123972, ¶ 14 (citing *Coty*, 2018 IL App (1st) 162383, ¶ 75).

¶ 62     However, the Illinois Supreme Court disagreed in *Coty* and held that, although *Miller* is based in part on the lesser culpabilities of youth, characteristics those with intellectual disabilities tend to share, "the *Miller* Court's decision is founded, principally, upon the *transient* characteristics of youth, characteristics not shared by adults who are intellectually disabled." (Emphasis in original.) *Id*. ¶ 39. Therefore, where juveniles, through neurological development may grow out of such deficiencies, such growth was not a prospect for the intellectually disabled adult defendant. *Id*. ¶ 40. "The rehabilitative prospects of youth do not figure into the sentencing calculus" for an intellectually disabled adult defendant. *Id*. The *Coty* court concluded that the intellectually disabled defendant's initial mandatory natural life sentence was not unconstitutional as applied to him. *Id*. ¶ 42. Accordingly, since the Illinois Supreme Court has declined to extend the holding of *Miller* and its progeny to include adult defendants with intellectual disabilities, defendant's argument that his *de facto* life sentence is unconstitutional as applied to him lacks merit.

¶ 63     Based on the foregoing reasons, we affirm the decision of the circuit court of Cook County.

¶ 64     Affirmed.

30